IN THE TENNESSEE COURT OF CRIMINAL APPEALS

AT JACKSON

MARCH 1999 SESSION



**FILED**

**December 8, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

VICTOR JAMES CAZES,                     )
                                        )   No. W1998-
00386-CCA-R3-PC                         )
                Petitioner,             )
                                        )   Shelby County
VS.                                     )
                                        )   Honorable Chris Craft
STATE OF TENNESSEE,                     )
                                        )   (Post-conviction: underlying offenses- first
                Respondent.             )    degree felony murder, aggravated rape,
                                        )    first degree burglary)

For the Petitioner:

Brock Mehler
751 Roycroft Place
Nashville, TN 37203


William D. Massey
3074 East Street
Memphis, TN 38128

For the Respondent:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General
        and
Jennifer L. Smith
Assistant Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493

William L. Gibbons
District Attorney General
        and
John Campbell
Assistant District Attorney General
201 Poplar Avenue - Third Floor
Memphis, TN 38103-1947


OPINION FILED:_____


AFFIRMED


Joseph M. Tipton
Judge

## OPINION


The petitioner, Victor James Cazes, appeals as of right from the order of

the Shelby County Criminal Court denying him post-conviction relief from his 1990

convictions for felony murder, aggravated rape and first degree burglary. The petitioner was sentenced to death for the murder conviction and received twenty-five-year and six-year sentences, respectively, for the aggravated rape and burglary convictions. The judgments of conviction were affirmed on direct appeal. State v. Cazes, 875 S.W.2d 253 (Tenn. 1994). In this post-conviction appeal, the petitioner raises the following issues:

> (1) whether the trial judge at the evidentiary hearing should have recused himself and reassigned the petition to another division of the trial court;
>
> (2) whether the petitioner was denied the effective assistance of counsel;
>
> (3) whether the petitioner was denied his right to an impartial jury;
>
> (4) whether the use of the petitioner's felony convictions as an aggravating circumstance violated the principles of due process and ex post facto;
>
> (5) whether the state withheld exculpatory information;
>
> (6) whether the reasonable doubt jury instructions were constitutional;
>
> (7) whether the cumulative effect of the foregoing errors deprived the petitioner of a fair trial and due process;
>
> (8) whether a harmless error analysis relative to invalid aggravating circumstances is constitutional; and
>
> (9) whether the trial court erred by not conducting an in camera review of the prosecutor's files.

We affirm the trial court's denial of the post-conviction petition.

The facts surrounding the crimes in this case are described by the Tennessee Supreme Court in its opinion on direct appeal as follows:

> The State's proof introduced at the guilt phase of trial demonstrated that on Sunday morning, April 24, 1988, the body of Gladys Skinner, an older woman who lived alone, was found in her home in the Frayser area of Memphis. She had last been seen alive late Saturday night by Ben Harris, a friend who brought her home from a card game. After checking Ms. Skinner's house to make sure everything was "safe and secure," Harris left around 12:10 a.m.
>
> The next morning, because her telephone was busy each time they called, Gladys Skinner's daughter and grandson went to her house to check on her. When they arrived, they noticed that a front window screen had been removed, that the window was broken, that blood was on the window blinds, and that the doors to the house were locked. The grandson and a neighbor entered the house through the

front window and found Gladys Skinner's body lying beneath some bedcovers on the bedroom floor, between the bed and the wall. The wall next to the bed was spattered with blood as were several pictures from the wall that lay broken on the floor. Blood also stained the floor and the fitted sheet on the bed. While the bedroom had been ransacked, nothing of value was missing from the house.

Gladys Skinner's nude body was lying face down, her knees underneath her with her buttocks "jacked up off the floor" and her legs spread apart. Scrape marks were found on her inner legs and vagina. Her right breast had been bitten and her left breast was scraped. Dilation of the vagina and rectum demonstrated penetration at or after the time of death; however, no sperm were found. Numerous marks and bruises were found on her body, including defensive wounds to her arms and hands, and a large bruise on her back that the proof indicated could have been caused by a fist.

The Shelby County medical examiner testified that the victim's death was caused by skull injuries that were inflicted by multiple blows to the head with a blunt instrument, like a welder's chipping hammer. According to the medical examiner and a forensic anthropologist who examined the skull, the number of blows had ranged from eight to fifteen and the skull had been "virtually shattered" by the force of the blows. Their proof showed that one or more of these injuries would have caused death within minutes to an hour, but the victim would not necessarily have lost consciousness immediately. A forensic serologist's testimony indicated that the assault may have continued for some time. The serologist testified that some blows may have been struck after the blood from some of the wounds had begun clotting, and that it takes three to fifteen minutes for blood to clot outside the body.

At the time of the murder, the defendant, Victor Cazes, a welder, worked sporadically as a handyman at an automotive repair garage owned by Michael Lucas, Gladys Skinner's step-grandchild. Before the murder, Cazes had been to Gladys Skinner's house two to three times to work on her car. On Saturday night, April 23, 1988, Cazes attended a birthday cookout at Lucas's home, which was a few blocks from Skinner's house. He left the gathering alone around 10 or 11 p.m.

Circumstantial evidence tied the defendant, Victor Cazes, to the offense. His finger and palm prints were found on the front window screen and frame. Two of his fingerprints were lifted from a light bulb beside the back door and fresh pry marks were found on the [back door]. Gladys Skinner routinely left this back light on at night, and it was on when Ben Harris left her house shortly after midnight Sunday morning. When her body was found, the light was off and the bulb was loose in its socket, as if it had been unscrewed.

Michael Lucas testified that Victor Cazes owned two or three chipping hammers, which Lucas described as blunt instruments made entirely of steel with a point on one end, a chisel flat on the other end, and a coil-wired handle. A forensic anthropologist testified that a pattern of depressions located in the involved portion of the victim's skull were consistent with ridges on the striking surface of a particular welder's chipping hammer owned by Cazes. The hammer had been crafted into a metal knick-knack by Cazes after the crime and given to a friend's mother. The forensic serologist also testified that a

3

transfer blood stain on the victim's bedsheet was caused by contact with a wet, bloody object which was consistent with the size and shape of this same chipping hammer and another like it that Cazes had left at the home of his friend's mother.

Dr. Richard Souviron, a forensic odontologist, testified that, based upon his comparison of the bite marks on Gladys Skinner's breasts with molds and models of Cazes' teeth, he had concluded to a reasonable degree of dental certainty that Cazes' teeth had made the bite marks on the victim's body at or about the time of her death. Another forensic odontologist, Dr. Harry Mincer, testified that the defendant Cazes could have made the bite marks on the victim. Two women who had engaged in sexual intercourse with Cazes testified that he had also bitten them, and that the victim's body position was one he preferred during sex.

The defendant presented no proof.

Based on this evidence in the guilt phase, the jury found the defendant, Victor Cazes, guilty of first-degree felony murder in the perpetration of rape, and also guilty of aggravated rape and first-degree burglary.

In the sentencing phase of the trial, the State relied upon the evidence presented during the guilt phase and also introduced records of the defendant's previous convictions in Shelby County, Tennessee, in February 1990 for "assault [with intent to commit murder in the first degree] with bodily injury" and for aggravated rape.

In mitigation, the defendant introduced medical records from the period of his incarceration in the Shelby County Jail to show that he had required medical treatment on several occasions as a result of fights, and that he had been placed on suicide watch twice while incarcerated. An acquaintance testified that the defendant was a heavy user of alcohol, marijuana and cocaine, and that he sometimes could not remember what he had done while he was intoxicated.

The defendant and two of his brothers testified about his background. One of twelve children, the defendant had been unable to control his urination until he was twenty. He testified that his father had beaten him when he was young. One brother described the defendant as "hot-tempered" and "always fighting." The defendant said that he fought because other people would tease him when he wet on himself. In the seventh grade, after being arrested for truancy, the defendant set fire to his jail cell. He underwent a psychiatric examination and was sent to reform school, where the fights continued. After his release from reform school, the defendant married twice. He has one child from his second marriage. The defendant had worked for a substantial wage as a welder in Louisiana, and a brother described him as a "hard-working man." The defendant testified he began drinking after his first divorce and admitted using various drugs and flying into rages.

As to the crime itself, the defendant testified that on Saturday night, April 23, 1988, he was "full of it" and "well on [his] way" to being drunk when he left the cookout at Michael Lucas's home. After leaving the cookout, he drank a bottle of Jim Beam on his way to a bar where he "got totally drunk." He stated that he remembered nothing more about the night.

4

Dr. Wyatt Nichols, a clinical psychologist, testified that while the defendant was competent to stand trial and not legally insane, there were signs to indicate psychological problems. Dr. Nichols specifically mentioned the defendant's long history of chemical dependency and multiple drug abuse. He also suggested that the defendant might have an impulse control problem which, along with the history of bedwetting, was possibly indicative of minimal neurological damage.

Based on the proof, the jury found the existence of three aggravating circumstances beyond a reasonable doubt, which were: (1) that the defendant had been previously convicted of violent felony offenses; (2) that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) that the murder was committed while the defendant was engaged in committing a felony. Tenn. Code Ann. § 39-2-203(i)(2), (5), and (7) (1982).[1] In addition, the jury found that the mitigating circumstances were not

sufficiently substantial to outweigh the aggravating circumstance and as a result, sentenced the defendant to death.

Cazes, 875 S.W.2d at 257-59.

At the post-conviction evidentiary hearing, Gloria Shettles, a private investigator hired on behalf of the petitioner, testified that she obtained the names of twenty-eight witnesses from the prosecutor's original trial files. She said she located fifteen of these witnesses and interviewed nine of them, including former employers. Ms. Shettles testified that those interviewed were very cooperative but that they could not recall some information. She said that three of the petitioner's former employers indicated that the petitioner was an excellent worker but that the petitioner had difficulty getting along with coworkers and following directions. Ms. Shettles said that the employers also reported that the petitioner did not take criticism well and was impatient, emotional and impulsive. Ms. Shettles said that others told her that the petitioner was quiet and a loner. Ms. Shettles testified as follows:

A lot of these people had been, or had observed [the petitioner] when he was drinking. And so a lot of their remarks had to do with a definite change in his behavior under the influence of alcohol. And they spoke to that . . . . They talked about [the petitioner] literally being in control one minute and not being in control the next. They couldn't give -- they were consistent in their remarks, but they couldn't give me any basis for it, even in their opinion. That he was sitting there and was fine, and then the next minute [he] might become very angry at somebody and would act out on that anger . . . . Well, people made -- almost everyone made a remark such as, it seemed as though he had a mental problem. He might have

---

[1]The felony murder aggravating circumstance was reversed on appeal, and the supreme court found that its application was harmless.

5

had a split personality. Obviously, these people aren't experts. But, in their opinion he would have a wild look, for instance, after he was drinking. There was a noticeable change that they could describe.

Ms. Shettles testified that the information she gathered from her interviews was consistent with the information found in the police reports.

Dr. Pamela Auble, a clinical neuropsychologist, testified that she conducted a psychological and neuropsychological evaluation of the petitioner. Dr. Auble stated that before testifying at the evidentiary hearing, she reviewed a social history prepared by Sarah Ottinger; reports prepared by Drs. Rossby, Nurcombe and Smith; and the results of tests she administered on the petitioner, including an intelligence test, an achievement test in reading and writing, a memory test, two tests of mental flexibility, two language tests, two tests of motor speed and dexterity, and five personality tests. Dr. Auble said she also interviewed the petitioner.

Dr. Auble testified that the petitioner was cooperative during the tests and the interview. She also stated:

> [T]here was no evidence, or no strong and conclusive evidence that the memory and thinking that [the petitioner] does is a lot different from what other people do. A problem that would indicate or suggest that parts of his brain, you know there might be holes in parts of his brain, or damage in certain areas of his brain. . . . It's known that, things like head injuries, often cause emotional lack of control, impulsiveness and an inability to control emotions. But, they're also associated with difficulties with memory and thinking. I didn't really find that with [the petitioner], which indicates to me that the troubles that he has controlling his emotions are more likely to be the result of a chemical imbalance, or something along that line, rather than the results of a head injury, per se.

With regard to the personality tests, Dr. Auble testified as follows:

> [The petitioner] is someone who tends to brood and ruminate about wrongs that have been done to him. He thinks a great deal. He has probably a rich internal life, that is how he kind of copes with his world. He kind of retreats into fantasy or thinking. The personality testing indicated that he can be impulsive and he can act out under stress. He doesn't have very good emotional controls. From the personality testing [the petitioner] is somebody who has a lot of difficulty relating to other people. Some parts of him wants [sic] closeness, other parts feel angry and rejected. He is ambivalent about both women and men, and in general, I think, tries to keep people at a distance. He tends to be suspicious of people. You know, to believe that others would hurt him if they were given the chance. There was also evidence on the personality testing of confusion about sexuality, and [mother-son] relationships.

6

Regarding the petitioner's social history, Dr. Auble testified that the petitioner is the ninth of eleven children and that until he was in his twenties, the petitioner suffered from enuresis, which caused the petitioner to urinate on himself both while asleep and awake. Dr. Auble stated that because of this condition, the petitioner was "picked on" by his family and other children. Dr. Auble testified about physical abuse the petitioner suffered from both parents at an early age, fights he had with his siblings, and discipline problems he had in school, including an attack on a teacher and a principal and his inability to relate to other students, which led to expulsion from two elementary schools.

Dr. Auble testified that she diagnosed the petitioner with intermittent explosive disorder, which she said is consistent with Dr. Rossby's finding of low serotonin levels. With respect to serotonin, Dr. Auble stated that:

> Serotonin is a neuro-transmitter. It's one of several in the brain. Neuro-transmitters have various functions. Serotonin has been associated, primarily, with inhibitory functions. Specifically, and probably the most relevant for this inhibitor, are functions of the amygdala which is a brain structure, kind of in the mid-brain limbic system. The amygdala is responsible for emotional memory. Disruption of amygdala function causes rage reactions. A low serotonin level would be something that would decrease inhibition in the amygdala, making it more likely that a rage reaction might occur.

Dr. Auble testified that the petitioner's intermittent explosive disorder is "characterized by periods of rage, which are often triggered by fairly minor events, during which the person has no control . . . [a]nd then, they eventually subside." According to Dr. Auble, the petitioner has suffered from this disorder since childhood. Dr. Auble testified that this disorder could be attributed to traumatic experiences the petitioner had as a child, as well as the petitioner's low serotonin level. Dr. Auble stated that the petitioner would sometimes enter a dissociative state, triggered by a minor event related to past traumatic experiences, and afterward, the petitioner would have no memory of what occurred while he was in that state. Dr. Auble also concluded that the petitioner exhibited schizotypal personality disorder with antisocial and compulsive traits.

Dr. Auble testified that the petitioner's history of alcohol and drug abuse would contribute to lowering his serotonin levels and inhibitions. Dr. Auble testified that:

7

> [the petitioner's] violence towards women increased, from the time he was married and coincided with the greater alcohol use . . . . Yes. Certainly, a correlation, yes. An association between the disinhibition of alcohol and, you know, [the petitioner] has just immense amounts of underlying anger. A lot of that towards women. In the context of alcohol and substance abuse, in the context of relating to a woman, you know, those would come together and make it more likely for him to experience anger, rage, intermittent explosive disorder and dissociative episodes.

Dr. Auble testified that had she been contacted before trial, she would have recommended further analysis and investigation of the petitioner's brain chemistry, specifically testing of the cerebrum spinal fluid, which would have shown the low serotonin levels. Dr. Auble explained that "given the organic and psychological problems, the history of physical and emotion [sic] abuse and neglect, the intoxication at the time, that it is . . . likelier than not that [the petitioner] was in a dissociative state and was unable to conform his conduct to the requirements of the law, unable to control his behavior."

Dr. Auble testified that she did not personally perform all the tests administered on the petitioner during the evaluation; only reviewed a summary of the transcript prepared by post-conviction counsel; and did not discuss the matter with Dr. Nichols, the defense expert at trial, except for reviewing his notes and data. Dr. Auble testified that she did not remember whether she asked the petitioner about the events surrounding the murder or whether he was using alcohol or drugs at the time. She testified, however, that she believed that another expert was supposed to focus on that aspect.

Dr. Murray Smith, a specialist in internal and addiction medicine and the Medical Director of Baptist Hospital's drug and alcohol treatment center, testified that he evaluated the petitioner both medically and in terms of addiction medicine. Dr. Smith testified that he reviewed summaries of the trial transcript and previous medical records prepared by post-conviction counsel; the reports of Drs. Rossby, Auble and Nurcombe; the social history prepared by Sarah Ottinger, and he interviewed the petitioner for about four hours. Dr. Smith stated that he also performed blood and glucose tests on the petitioner. Dr. Smith testified that the petitioner exhibited signs of hypoglycemia,

which is a significantly low blood sugar level that results in stressful, hyper-irritable and excitable feelings. He said that adrenaline levels would increase to raise the blood sugar level. Dr. Smith further testified that alcohol, though initially raising the blood sugar level, would eventually lower the level. He stated that persons suffering from hypoglycemia would crave alcohol to get a "quick fuel supply." Dr. Smith stated as follows:

> There's [sic] two symptoms a person feels. One is the affect of the low sugar itself. And the second is the affect of the adrenaline. The affect of the low sugar itself may be the feeling of confusion. A feeling like spaciness, like things aren't working well, like poor focus, poor concentration, poor memory. Then the affect of the adrenaline includes increased heart rate, increased breathing rate, increased blood pressure, increase [sic] muscular activity with shakiness. A sense of impending doom. A sense of anxiety. A sense of irritability. Even some paranoia.

Dr. Smith testified that stress, the petitioner's alcohol and chemical dependency, and the petitioner's diet of "fast food type foods with a very heavy intake of Coca-Cola, regular Coca-Cola" caused the petitioner's hypoglycemic condition. Dr. Smith believed that the petitioner inherited the brain chemistry which fostered his alcohol and chemical addiction. Dr. Smith stated that the petitioner informed him that he experienced alcohol induced blackouts. Dr. Smith also stated that the summary of the trial transcript indicated that other witnesses testified about the petitioner's blackouts. Dr. Smith testified that the general opinion in his profession is that alcohol releases the inhibition against violent rageful behavior rather than producing that type of behavior. Dr. Smith testified that for people who suffer from intermittent explosive disorder, the addition of alcohol and drug addiction "would be like pouring gasoline on a fire." In addition, Dr. Smith testified that alcohol and cocaine use increases the likelihood of the severity of hypoglycemic reactions.

Dr. Smith testified that alcohol contributes to lowering the serotonin level over time, which causes irritable and suspicious feelings, and an inability to inhibit behavior. Dr. Smith testified that a combination of alcohol abuse, low serotonin, hypoglycemia and intermittent explosive disorder, such as he believed was present in the petitioner, would prevent a person under severe emotional stress from controlling his behavior. Dr. Smith stated that all these conditions are treatable and that treating them would reduce the risk of uncontrollable behavior. Dr. Smith agreed with Dr.

Auble's diagnosis of intermittent explosive disorder and stated that he believed the petitioner has antisocial personality disorder as well.

In response to a question about what might have triggered the petitioner's violent behavior on the night of the crime, Dr. Smith stated:

> I can tell you what I believe. I believe that as a child [the petitioner] had something very, very horrible happen to him in regards to an older woman. His mother says that she will take whatever it was to her grave and will not talk about it. And because of dissociation, [the petitioner] cannot ever know what it was. And that whatever triggered his violent, uncontrollable activity that night, was triggered by something that related to an older woman and that particular situation. And I may never know and you may never know. And [the petitioner] certainly wouldn't know. But, I believe it happened. And I believe it based on a lot of literature and based on a training program that I went to in New Orleans at River Oaks Hospital. That this type of thing happens . . . . It's more than a guess. It's an educated summary of all the materials. If I took just one part of it, no I couldn't, but taking the big picture of what his mother said, of his history, of his reactivity to women. The big picture would suggest that this is what happened to him. And that he was triggered into a dissociative state where he had absolute loss of control that his functional self wasn't there. All he was was a reactive self.

Dr. Smith further testified that a person in a dissociative state could premeditate, i.e., act "very clever . . . because it is survival."

Dr. Smith stated that although he reviewed the summary of the transcript prepared by post-conviction counsel, he did not ask the petitioner any questions about the facts and circumstances surrounding the crime. Dr. Smith testified that it was not necessary to question the petitioner on this because the summary of the transcript noted that the petitioner had no recollection of the events. He testified that in addition, the only report of the petitioner's intoxication on the night of the murder came from the petitioner himself. He said that the petitioner told him that he started drinking between 3:00 and 5:00 p.m. and consumed two pints of whiskey. Dr. Smith testified that although the petitioner could not recall the specific events of that night, the petitioner told him that he would normally ingest two Valium pills and several lines of cocaine and smoke two to three marijuana cigarettes.

Dr. Barry Nurcombe, a psychiatry professor and the director of child and adolescent psychiatry at Vanderbilt University, testified that he interviewed the

10

petitioner four or five times for a total of eleven hours. Dr. Nurcombe said he also reviewed the petitioner's social history; a summary of the trial transcript; and reports from Drs. Rossby, Smith and Auble during his evaluation. Dr. Nurcombe said he did not test the petitioner. Dr. Nurcombe testified that the petitioner suffered from intermittent explosive disorder, polysubstance abuse, paranoid personality disorder, hypoglycemia and a low serotonin level. He testified that ninety-nine percent of the same sex, race and age population as the petitioner have higher serotonin levels than the petitioner. Dr. Nurcombe stated that the combination of these factors would cause the petitioner to have difficulty controlling violent impulses. According to Dr. Nurcombe, the petitioner's capacity to conform his conduct to the requirements of the law was impaired at the time of the offense in this case.

Dr. Nurcombe testified that research in this field since the early 1980s has demonstrated that low serotonin levels are associated with violent impulsive behavior. He said the research further demonstrates that recidivist offenders of violent crimes tend to have a lower serotonin level than do nonrecidivist offenders. He said that a combination of hypoglycemia and low serotonin levels seems to be a possible indicator of recidivism. Dr. Nurcombe stated that alcohol consumption and intermittent explosive disorder are also factors.

Dr. Nurcombe testified that individuals have certain memories that are reactivated by situations or events that remind the individual of terrifying or emotionally arousing experiences from the past. He said the person will not usually remember the past event, but when the emotion from the past event is triggered by something in the present, not necessarily recognized by the person, an automatic discharge of behavior, feeling and emotion occurs. He testified that serotonin helps the individual control these automatic discharges. According to Dr. Nurcombe, lower serotonin levels, like the petitioner has, severely impair the ability to control the automatic discharges of emotion or behavior. Dr. Nurcombe stated that after reviewing the petitioner's social history prepared by Ms. Ottinger, he found the following factors relevant with regard to the generation of emotional memory in the petitioner:

> The social history . . . did indicate a considerable degree of emotional and physical abuse . . . . First of all [the petitioner] was the ninth of eleven children. He was born . . . into a family

which was identified, I think, ethnically with the Cajun group in Louisiana. His family was very poor. Early in their marriage [the petitioner's] parents are said to have had a turbulent marriage. Although by the time he was born, this was less apparent. The parents, however, were described as disengaged from each other. This was a family in which affection was not expressed. And, in fact, the only emotion that was expressed, and in fact, encouraged to be expressed was fighting between the siblings. By the time [the petitioner] was born, his mother left much of the child rearing and child care to the older daughters in the family . . . . [The petitioner] suffered from early childhood to the age of 21 with severe problem [sic] of urinary incontinence, which involved both daytime and nighttime incontinence . . . . The mother is said to have been punitive towards him for this. The other siblings humiliated him. His nickname at home was "piss-bug." . . . In fact, from the very first day of school he remembers being separated from the classroom for having been incontinent and being made to stand in a corner. And this happened frequently when he was at school. And for other children rejecting him or humiliating him on these grounds . . . . [The petitioner] was subject from middle childhood, onward, to attacks of rage, which became extremely severe by the age of 11 to 12 years. As a result of his attacks of rage, of impulsive running away from school, he was suspended, expelled, in fact, from two schools. And had very significant difficulties in the third and final school that he attended. Rage, assaults on teachers, impulsive running away, provocation towards other children, together with the problem of enuresis indicated that by the time he reached grade five he was in serious difficulties, emotionally.

Dr. Nurcombe testified that the petitioner's social history suggests that he had low serotonin levels as a child. Dr. Nurcombe discussed the physical abuse the petitioner suffered from his parents, and he said it is significant that the petitioner has no memory of his mother's physical abuse toward him. Dr. Nurcombe stated that the evidence of abuse by the petitioner's mother was gathered from the petitioner's siblings. Dr. Nurcombe believed that the petitioner repressed these memories. Dr. Nurcombe also considered significant two school reports that described the petitioner as being in a "trance" and "out of touch at times." According to Dr. Nurcombe, these reports are consistent with a dissociative tendency.

Dr. Nurcombe testified that the petitioner abused alcohol in an effort to overcome his anger toward his wives. Dr. Nurcombe explained that the more the petitioner drank, the more irritable and explosive he became because his serotonin levels would eventually drop even further. Dr. Nurcombe stated that low serotonin, aggravated by alcohol abuse, disinhibits and enables the release of repressed emotional memories. Dr. Nurcombe testified that the petitioner's hypoglycemia, in

connection with the low serotonin, intermittent explosive disorder and alcohol abuse, would increase the petitioner's lack of control.

Dr. Nurcombe testified that he would not necessarily have described the petitioner's condition in the same way as Dr. Nichols. Dr. Nurcombe stated that the petitioner was in a "fugue state," wherein the petitioner was in a continuing impulsive violent rage triggered by a momentary experience. When asked whether the petitioner would have the capacity to conform his conduct to the requirements of the law, Dr. Nurcombe initially responded that the petitioner's ability to do so would be significantly impaired. Upon further questioning, he stated that assuming the petitioner was intoxicated, hypoglycemic, and experiencing a low serotonin level and intermittent explosive disorder triggered by some event, the petitioner's ability would be so significantly impaired as to prevent the petitioner from conforming his conduct to the requirements of the law.

Dr. Nurcombe testified that although the petitioner did not remember committing the murder, the petitioner did remember that he drank and took drugs earlier that evening. Dr. Nurcombe also stated that the petitioner was convicted in Louisiana of a sexual offense about which he was able to remember the circumstances surrounding the offense. Dr. Nurcombe testified that the ingestion of drugs and alcohol were the main factors that triggered the event in the present case. Dr. Nurcombe admitted that he could not identify any emotional trigger, but he added that the trigger could be something minor that would not necessarily be identified by anyone else.

When asked by the court how an explosive disorder can be justified when there was evidence of planning in this case, Dr. Nurcombe explained that because the petitioner drank so heavily and blacked out, something likely occurred during this intoxicated state to trigger the petitioner's emotional memories. According to Dr. Nurcombe, this in turn led the petitioner to act out his revenge fantasies against women. Dr. Nurcombe stated that although the petitioner did not inform him of any revenge fantasies toward women because he is not consciously aware of them, the petitioner did describe revenge fantasies and violent reactions against people in prison who had slighted or humiliated him. Dr. Nurcombe explained that there is some sense

13

of primitive self-protective behavior when a person is in a "fugue state" and that the person's behavior in a "fugue state" is more automatic and outside conscious awareness. Finally, Dr. Nurcombe testified that the petitioner's "plain meanness" would be attributable to his mental disorders.

James Ball testified that he and Dwight Duncan were appointed to represent the petitioner after the trial court relieved the Office of the Public Defender. Mr. Ball testified that he had been practicing law since 1961 and estimated that he had been involved in thousands of criminal cases, including several capital cases. Mr. Ball testified that he assumed the case was "pretty much worked up" when he took it over because the capital defense team at the Public Defender's Office had the case for about thirteen months. Mr. Ball testified that the court appointed him to the case around July 9, 1990. He said that the trial was originally scheduled to start on September 10, 1990, but they obtained a continuance until September 24, 1990. Mr. Ball further testified that Mr. Duncan was not available to assist him until late August.

Mr. Ball testified that he did not recall whether he was familiar with the filing of ex parte motions for expert services in capital cases. He said that Dr. Nichols evaluated the petitioner while the public defender represented him. Mr. Ball testified that his first contact with Dr. Nichols was sometime in September and that Dr. Nichols suggested the possibility that the petitioner suffered from an organic brain impairment, which severely limited his ability to control his impulses when angry. Mr. Ball testified that Mr. Duncan filed a motion for additional support services on September 29, 1990, upon receiving a letter from Dr. Nichols on September 28, 1990, explaining that the petitioner might be suffering from an organic brain disorder. Mr. Ball testified that they wanted an M.R.I. and a Q-beam performed on the petitioner. He said that they filed the motion during the guilt phase of trial, and the trial court denied it.

Mr. Ball testified that he received discovery from the state but that he did not receive the police reports from the case. Mr. Ball also testified that both Mr. Duncan and the public defender requested the petitioner's school records from Louisiana but never received them. Mr. Ball testified that he personally traveled to Louisiana and met with the petitioner's family for several hours but that they were not very cooperative. He

14

said he asked to talk to the petitioner's mother, but the family refused because they did not want her to be involved. Mr. Ball testified that although he attempted to have the entire family testify during the sentencing phase, only two of the petitioner's brothers appeared. Mr. Ball said he did not meet with any of the petitioner's former teachers or principals. However, he said he knew that the petitioner had a troubled childhood, including problems in school. Mr. Ball said that from conversations with the petitioner and some of his acquaintances, he discovered that the petitioner abused drugs and alcohol. He said he reviewed the petitioner's social history prepared for the post-conviction hearing and testified that the information would have been helpful to the defense at trial. However, he stated that during sentencing, testimony revealed facts about the petitioner's childhood and alcohol and drug abuse, as well as his possible neurological problems.

Mr. Ball testified that he met with the petitioner often before trial and was able to carry on intelligent conversations about the proof and available defenses. He said he believed that the petitioner was competent to assist in his defense. Mr. Ball said he never considered the petitioner to be out of touch with reality during the trial. He said he knew that the petitioner was taking antipsychotic drugs while in jail. He stated that the most damaging evidence against the petitioner at trial was circumstantial: the fingerprints at the scene and the bite marks on the victim. Mr. Ball said that the state apparently lost one of the fingerprints taken from the screen in front of the victim's house. Mr. Ball testified that he and Mr. Duncan defended on the merits of the case, meaning they made the state prove its case beyond a reasonable doubt because "that's what [he] thought needed to be done." Mr. Ball stated that the petitioner had been to the victim's residence before because he was a friend of her grandson. He said that he and Mr. Duncan filed a motion on August 29, 1990, for expert services to assist in rebutting the state's experts on the fingerprints, the bite marks, and the chipping hammer, but the motion was denied. Mr. Ball testified that they fully discussed the case with the petitioner and that the petitioner did not object to the trial strategy. Mr. Ball testified that the petitioner was not in favor of an insanity defense. He said the decision to forgo an insanity defense was made before Dr. Nichols sent him the letter suggesting that more testing might be helpful. Mr. Ball testified that Dr. Nichols examined the petitioner before trial and that Dr. Nichols stated

15

that he believed the petitioner was competent and legally sane at the time of the offense.

Judge James C. Beasley, Jr., former Assistant District Attorney General, testified that he helped prosecute the petitioner's case. Judge Beasley testified that he gave defense counsel a copy of his entire file when they were appointed to represent the petitioner. Judge Beasley testified that this was not his normal procedure but because petitioner's counsel were appointed after the public defender was relieved prior to trial, he gave new counsel everything he had, except possibly the police reports. Judge Beasley recounted the mitigation proof presented by the defense, including the petitioner's own testimony, as follows:

> It was -- I mean, I think you would have to be very cold not to have been moved by it. Even though I was the prosecutor and even though I was seeking the death penalty, I felt it was moving testimony. And I think I was concerned, especially when the jury stayed out in the sentencing phase for five or six hours, two or three times longer than they had in the guilt phase. It concerned me greatly that they may be being swayed by this proof that he had put on.

Judge Beasley testified that the state questioned the petitioner on cross-examination about the events on the night of the murder but that the petitioner testified that he did not recall anything about the offense. Judge Beasley testified that the jury appeared to be very emotional when they returned with their verdict. Judge Beasley testified that even if the defense had offered expert testimony during the guilt phase suggesting that the crime was impulsive, he still would have argued to the jury that the petitioner planned his actions and acted with premeditation.

Dr. Daniel A. Martell, a forensic neuropsychologist, testified that forensic neuropsychology encompasses the study of brain damage and its effects on human behavior as it relates to the law. Dr. Martell stated that before his two-day evaluation of the petitioner, he reviewed the post-conviction testimony of the petitioner's experts, the petitioner's prison records, the police reports, and selected portions of the trial transcript and the medical records of the petitioner's mother. Dr. Martell said he interviewed the petitioner and administered several tests, including memory tests; a language test; a psychological disassociation test; a battery of tests to detect malingering; tests

16

measuring psychopathy, antisocial behaviors and substance abuse; and the MMPI psychological personality test.

Dr. Martell testified that the petitioner has low serotonin and hypoglycemia. However, he also testified that:

> the research that attempted to link low serotonin to violent behavior I think is -- has been over represented to the Court, the strength of that association. A careful reading of the literature indicates that it's not tied to violent behavior per se, but rather is tied to impulsive behavior, of which violence or aggression is sometimes a subset.
>
> A careful examination of the trial record indicates that Mr. Cazes's behavior in conducting the crime was not impulsive. And the finding from the research is that low serotonin is related to impulsive criminal offending.
>
> In fact, when you look at the criteria for the research groups, people were determined not to be impulsive if, number one, they knew the victim, which Mr. Cazes did in this case; and number two, if there was evidence of premeditation in the conduct of the violent crime. And I believe a reading of the record indicates that there was that level of premeditation, of non-impulsive, planned, goal-oriented behavior, and I'm prepared to give the Court my impression from reading the trial record of evidence of that lack of impulsivity.
>
> . . . .
>
> The first issue is the fact that he selected a victim that was known to him, which, as I mentioned from the research studies, would be rule-out [sic] for impulsivity.
>
> In addition, upon arriving at her residence, he obtained a chipping hammer, which I understand to be a welder's tool, from his car, which he used both in attempting to gain entry to her residence as well as in the assault on Ms. Skinner. The fact that he had the foresight to plan ahead and obtain this tool to help him indicates that he was not behaving in an impulsive way, but rather in a goal-oriented way. He appreciated the nature and consequences of what he wanted to do, i.e., obtain entry into her locked house and gain access to her, and it also indicates an ability to control his behavior. He didn't go rushing out of his car and banging on the door or smashing out the window. He was careful in taking a tool with him to perpetrate the crime.
>
> The fact that he unscrewed the light bulb illuminating the backyard is further indication that he knew what he was doing or what he wanted to do was wrong and that he wanted to reduce his risk of detection by reducing the illumination in that situation. So it's purposeful behavior directed at avoiding detection of his behavior. Again, that is not impulsive. He didn't go cracking at the door and smashing out the window until he reduced his risk.
>
> There's evidence at the back door of evidence of trying to -- of pry marks to open that door. Failing . . . for some reason at being able to do that, whether it was making too much noise or he couldn't get the door open, I don't know, but

17

for some reason he abandoned that effort, he then was able to plan an alternative strategy. He was able to shift from trying to gain entry through the back of the house and go around to the front of the house, where he may have attempted to gain entry through the front door, which had an iron gate on it, and ultimately selected an accessible window as his mode of entry.

The ability to shift your behavior, to start in on one plan of attack, meet an impediment and then have the problem solving ability to avoid that and go around and find another way to get in again is evidence that it's not impulsive. This is focused, goal-oriented behavior, aimed at obtaining a specific reward; that is, getting access into her secured home and gaining access to her.

Even upon selecting the window he still had to deal with the screens that had been installed there and had to remove the screens. Again his dogged pursuit of his goal of gaining entry into the house at whatever means necessary, mangling the screen, breaking out the window, all of these things are not impulsive, but instead are planned, focused, goal-oriented behaviors.

Once inside the house, the evidence indicates that he centered his behavior on the victim's bedroom where she was. He is not elsewhere in the house breaking into things. Everything is focused where the scene of the sexual assault takes place.

Upon encountering Ms. Skinner, he subdued her with blows to her head and body with the chipping hammer. This was to render her compliant to his wishes, to reduce her ability to call the police or to scream or to call for help. This is behavior that's very characteristic of sexual homicide offenders as they have been profiled by the FBI's Behavioral Science Unit and as they've published about the behavior of individuals who do this. This is very typical behavior of sexual homicide offenders to use this kind of blitz attack on the victim to subdue them and to get them to cooperate with their wishes.

Again, this is not impulsive behavior. This is purposeful, goal-directed behavior in order to permit him to accomplish the sexual act that he has come there to do.

In addition, after subduing her, he engages in sexual behaviors that are particularly pleasing to him, including biting the victim in certain places and posing her body in sexual positions that he found arousing and that were his favorite positions to do that. Again, this is practiced and purposeful behavior for his own sexual gratification, not impulsive behavior driven by some biochemical imbalance.

Following the assault, the evidence indicates that he ransacked her bedroom, pulling things out of the drawers, staging the crime scene to perhaps appear as if a robbery had occurred. Again, this kind of staging of the crime scene is not impulsive behavior, but rather is purposeful, goal-directed behavior, intended to misdirect investigators who come on to the scene and make them think that there was some other goal in mind during the course of the assault.

This type of forensic behavioral analysis to me indicates that this was not an impulsive crime, but rather was purposeful, focused, goal-directed, planned behavior, and that would be inconsistent with the research literature on glucose metabolism

and low serotonin that suggests that some of these offenders will engage in aggressive behavior that is impulsive.

Dr. Martell testified that the petitioner met the criteria for conduct disorder in childhood and antisocial personality behavior as an adult, but he testified that he disagreed with the diagnosis of intermittent explosive disorder because this disorder is characterized by sudden, unexpected rage attacks that must occur outside the context of other specific mental disorders, including intoxication. Dr. Martell testified that according to the petitioner's history, the petitioner's rage occurred only when he was intoxicated. Dr. Martell also disagreed that the crime was committed while the petitioner was in a dissociative mental state. He said that during his evaluation of the petitioner, the petitioner informed him that he had about twenty blackout spells after which he would not remember anything and that they all occurred while he was abusing either drugs or alcohol. According to Dr. Martell, the diagnosis of a dissociative disorder cannot be made if the disorder only occurs during a state of intoxication. Dr. Martell said that in addition, the petitioner scored below the cutoff for dissociation on the test he administered. Dr. Martell testified that the petitioner never engaged in a violent act during any of the other blackouts he experienced and that the petitioner did not claim to have amnesia during previous violent acts. Dr. Martell said that this indicates that the petitioner was not in a dissociative state at the time of the crime.

Dr. Martell testified that contrary to Dr. Auble's findings, he did not find any evidence of neuropsychological impairment. Dr. Martell opined that the petitioner was not giving his best efforts on the neuropsychological tests administered by Dr. Auble. Dr. Martell testified that the petitioner exaggerated his responses on some of the personality tests administered by Dr. Auble, which could have caused her to misinterpret the results. Dr. Martell testified that the petitioner was "emotionally labile, that he's demanding, that he can be hostile and irritable and evasive and suspicious and distrustful."

Dr. Martell testified that he reviewed Dr. Nichols' recommendation that the petitioner undergo further neurological evaluation and stated that even if further evaluation had been performed before trial, the results would not have supported an

insanity defense. Dr. Martell stated:

> I think even if it had led to the full examination that has been done in the last year or two, because of the reasons I've outlined for the Court this morning, none of these factors would have been relevant to his mental state.
>
> Serotonin doesn't matter because the crime was not impulsive. He doesn't meet criteria for intermittent explosive disorder or dissociation. He is an antisocial character. And even if this additional testing were done, we'd be at the same point that we are today, that it wouldn't support it.
>
> Dr. Nichols was the defense doctor, and he himself felt that he was not insane. He thought it would be nice to know more about his neuropsychological status, but even if we had pursued that at that -- if the Court had pursued that or the defense had pursued that at the time and it yielded the findings that we have today, it still wouldn't have contributed to his defense or to mitigation evidence.

Dr. Martell admitted that he used his own method instead of an official computer program from National Computer Systems in scoring some of the tests administered to the petitioner. Dr. Martell also admitted that more than one published authority exists regarding the results of some of the psychological tests administered. The petitioner's attorney attempted to discredit Dr. Martell's conclusions. For example, after citing to one of the authorities upon which Dr. Martell relied that stated that a disorganized crime scene suggests an impulsive crime, the attorney asked Dr. Martell how he concluded that the petitioner acted with purpose when the victim's bedroom was in such disarray. Dr. Martell supported his conclusion with the fact that the petitioner tried to deter detection by unscrewing the light bulb above the back door and by trying to pry the door open rather than kicking it open. Dr. Martell explained that the petitioner may have left the crime scene in disarray to mislead the police about the purpose of the crime. Regarding the petitioner's low serotonin level, alcohol abuse, and hypoglycemia, the following colloquy occurred:

> ATTORNEY: So those three factors in combination are good predictors of the likelihood of violent impulsive behavior?
>
> DR. MARTELL: Of impulsive violent behavior, that's correct.
>
> ATTORNEY: That's correct. And Mr. Cazes has all three of those factors in evidence, does he not?
>
> DR. MARTELL: He has the factors, but in committing this crime he was not impulsive.
>
> ATTORNEY: Well, again that goes to your definition of impulsivity.
>
> . . . .

DR. MARTELL: This is based on an analysis of his behavior as he conducted the crimes.

ATTORNEY: According to your notion of impulsivity?

DR. MARTELL: It is my opinion. That's correct.

Regarding the petitioner's treatment with Prozac while in prison, the following colloquy occurred:

ATTORNEY: And you asked him about how it had affected him, correct?

DR. MARTELL: I did.

ATTORNEY: And he responded that it had calmed him down?

DR. MARTELL: He did.

ATTORNEY: Isn't that in itself corroborative of the behavioral effects of low serotonin in Mr. Cazes?

DR. MARTELL: No, it is not, and let me tell you why. Mr. Cazes, during the period of time when he was being treated with Prozac, he had historically refused any treatment or contact until these proceedings and Dr. Nurcombe's diagnosis and the serotonin findings, at which time he did agree to take the Prozac. And he reports he felt better, and there is actually a note in the chart that said there was some improvement in his behavior.

However, at the same time that he was taking the Prozac he had at least two incidents where he flung feces on correctional officers during the time when he is being treated. And then he later refused to take the medication and continued to have this kind of behavior, not necessarily the throwing feces, but acting out to the point where he had to be put in the administrative segregation.

And it's also a consistent pattern with his prior disciplinary history in the institution. So that to me shows that there's no correlation between the Prozac treatment and his impulsive acting-out kind of behavior. I think it reflects antisocial personality, not serotonin depletion.

COURT: You're saying he felt better but he didn't act any better?

DR. MARTELL: That's correct, sir.

Dr. Auble was recalled and testified that she and Dr. Martell disagreed on whether the petitioner had intermittent explosive disorder, whether impulsive behavior can be purposeful and whether evidence of low serotonin, hypoglycemia and the findings in the petitioner's social history are significant mitigating factors. Dr. Auble testified that the petitioner could have acted "purposefully in the grip of an emotional impulse," similar to the actions of people with impulse control disorders like pyromania, kleptomania and pathological gambling. According to Dr. Auble, the crime in this case was the product of an emotional impulse with low serotonin, intoxication and

21

hypoglycemia contributing to impair the petitioner's inhibition of the emotional impulse.

Dr. Auble could not describe or identify any triggering event that caused the petitioner to retreat to this emotional state. She testified that she and Dr. Martell also disagreed about what personality disorder the petitioner has. She said Dr. Martell believes the petitioner has antisocial personality disorder, whereas she believes he has intermittent explosive disorder. Dr. Auble testified that the petitioner's aggressive outbursts did not occur only when the petitioner was intoxicated. She also testified that the petitioner could have been in a dissociative state while intoxicated. However, Dr. Auble said she could not identify any time during which the petitioner claimed to blackout while not intoxicated. After reviewing some of the physical exhibits from the original trial, Dr. Auble testified that the verbal description of the crime scene she received was sufficient for her to form an opinion about the impulsive nature of the crime without having viewed the exhibits. Based upon the foregoing proof, the trial court denied the post-conviction petition.

Under the Post-Conviction Procedure Act in effect at the time the petitioner filed his petition, the petitioner has the burden of proving the allegations in his petition by a preponderance of the evidence. McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1983). The trial court's findings of fact and conclusions of law in post-conviction cases are conclusive on appeal unless the appellate court finds that the evidence preponderates against the findings. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). Furthermore, this court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Black, 794 S.W.2d at 755. This includes giving deference to the trial court concerning witness credibility. Id.

## I. RECUSAL AND REASSIGNMENT

The petitioner contends that the trial judge conducting the post-conviction evidentiary hearing erred by denying the petitioner's motions to recuse the judge and to have the case reassigned to the division of the trial court to which it was originally assigned. The state contends that the issues are not properly before this court because they have been previously determined against the petitioner. Alternatively, the

state contends that the trial court properly denied the petitioner's motions.

Initially, we address the state's contention that the issues were previously determined against the petitioner. The state claims that the law of the case doctrine precludes reconsideration of these issues on direct appeal because the petitioner previously sought and was denied extraordinary review of these issues pursuant to T.R.A.P. 10. The grant of a T.R.A.P. 10 application is conditioned upon a showing by the appellant that "the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review" or that immediate review is necessary for complete determination of the action on appeal. If these requirements are not met, the application for permission to appeal is denied. However, this court does not necessarily reach the merits of the particular claims raised when it denies a T.R.A.P. 10 application. Instead, the court decides whether the claims raised must be addressed in an interlocutory or extraordinary fashion rather than subsequently on direct appeal. In the present case, the court concluded that immediate, interlocutory review was not necessary. Although the court's order refers to the particular issues raised, the court did not fully address the merits of the underlying claims. Accordingly, we conclude that these issues were not previously addressed and are now properly before us. See, e.g., State v. Ruane, 912 S.W.2d 766, 773-77 (Tenn. Crim. App. 1995) (addressing the merits on direct appeal even though the appellant's T.R.A.P. 10 application was denied and the order of denial referred to the underlying issue raised).

### A. Motion to Recuse

The petitioner contends that because the trial court judge was employed by the Office of the District Attorney General during the prosecution of the petitioner on an earlier, separate matter, thereby giving the appearance of partiality, the judge should have recused himself. The state contends that the trial court did not err by denying the petitioner's motion. We note that the trial court has discretion in determining whether to grant a motion to recuse. The court's decision will not be reversed on appeal unless the face of the record reveals clear abuse. State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995).

Canon 3(E)(1), Rule 10, Tenn. Sup. Ct. R., provides as follows:

23

A judge shall disqualify himself . . . in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it.

The commentary to this section provides:

A lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency within the meaning of Section E(1)(b); a judge formerly employed by a government agency, however, should disqualify himself . . .

in a proceeding if the judge's impartiality might reasonably be questioned because of such association.

We hold that the petitioner has not demonstrated that the trial court abused its discretion in denying the motion to recuse. The record reflects that although the trial judge was present in the courtroom during a hearing in a previous proceeding involving the petitioner, the judge stated that he merely received a copy of a motion filed by defense counsel because the prosecutor handling the matter was unavailable at the time. While the judge's name appears on the cover of the transcript in the earlier proceeding, no other mention of the judge's participation in the earlier proceeding exists. Moreover, the judge stated that he did not remember or know anything about the petitioner or his cases.

Nothing in the record before us suggests that the trial judge's impartiality could reasonably be questioned. The judge sufficiently explained why his name appeared on the cover of the transcript from the earlier proceeding involving the petitioner. Although the petitioner claims that the trial court's bias against him is evidenced by the denial of the petitioner's claims, adverse rulings by a court are generally insufficient grounds to establish bias. Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). The record is devoid of any suggestion that the trial judge demonstrated antagonism toward the petitioner or expressed any opinion about the merits of the proceeding before the hearing. See Id. at 821-22.

24

**B. Motion to Reassign**

The petitioner contends that his petition was transferred from one division of the trial court to another in violation of local court rules and that the trial court should have granted his motion to reassign the petition to the court in which it was originally filed. The state contends that the trial court properly denied the motion.

Initially, we note that some discrepancy exists as to which court the petition was originally assigned. The petitioner suggests that the petition was originally assigned to Division IX of the Shelby County Criminal Court. However, the court records reflect that the petition was filed in Division VII but that the trial judge in Division VII had a conflict with the petitioner and asked Judge Craft of Division VIII to hear the matter. The record shows that Judge Craft agreed, and the petition was heard in Division VIII, the same division in which the original trial was conducted. However, the trial judge who presided over the trial in Division VIII retired before the petitioner filed the present petition.

Rule 4.03 of the Shelby County Criminal Court Rules requires that a written order of transfer be filed to transfer a case from one division to another. The record in the present case contains no written order of transfer. However, Rule 4.05 provides that "[t]he judges may transfer cases among themselves by mutual consent" without the consent of the parties or counsel. Our reading of the record shows that this is what occurred in the present case. Obviously, the better practice would have been for a written order to have been filed. However, the petitioner has failed to demonstrate that he was prejudiced by the lack of a written order. See T.R.A.P. 36(b).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that his trial attorneys were ineffective at both the guilt and sentencing phases of the trial. Specifically, the petitioner argues that his attorneys failed to conduct an adequate investigation into his background, including his mental and physical conditions. He argues that the attorneys' deficient performance precluded the jury from considering possible defenses during the guilt phase and important mitigating evidence during sentencing. The state contends that the petitioner received the effective assistance of counsel.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is upon the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under Article I, Section 9, of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n. 2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974) and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

We also note that the approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.

Initially, we note that the petitioner contends that this court should adopt a de novo standard of review when addressing ineffective assistance of counsel claims in post-conviction appeals. He argues that the trial court's findings with respect to ineffective assistance are not binding on appeal because the issue involves a mixed question of law and fact.

26

In Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997), our supreme court stated the following relative to review of a trial court's post-conviction determinations following an evidentiary hearing:

> The findings of fact of the trial judge on a petitioner for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings. [Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996)]; Cooper v. State, 849 S.W.2d 744, 746 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). In evaluating whether the evidence preponderates against the trial court's findings, we are guided by longstanding rules of appellate procedure. Appellate courts in this State do not reweigh or reevaluate the evidence. We can not substitute our inferences for those drawn by the trial judge. Moreover, questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge. Finally, the party seeking to overturn the findings of the trial judge bears the burden on appeal of demonstrating why the evidence contained in the record preponderates against the findings of the trial judge. Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966); Cooper, 847 S.W.2d at 527; Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). It is with these principles in mind that we evaluate the findings of the trial court and the Court of Criminal Appeals with respect to the petitioner's claim of ineffective assistance of counsel at sentencing.

The court stated that the issue before it was "whether the evidence in the record preponderates against the trial court's finding that the petitioner failed to establish that he was denied his constitutional right to effective assistance of counsel." 960 S.W.2d at 580. See also Richard C. Taylor v. State, No. 01C01-9709-CC-00384, Williamson County (Tenn. Crim. App., July 21, 1999) (citing Henley and holding that the appropriate standard of review is whether the evidence preponderates against the trial court's findings). In light of Henley and Taylor, we reject the petitioner's claim that our review should be de novo.

We are aware, however, that the Tennessee Supreme Court recently used a de novo review standard in a direct appeal of a conviction when the issue of the effective assistance of counsel was presented. See State v. Brenda Ann Burns, No. W1996-00004-SC-R11-CD, Henry County, slip op. at 12 (Tenn. Nov. 8, 1999) (for publication). Given the summary fashion in which the court addressed the standard of review in Burns, we seriously doubt that it intended to overrule Henley and thirty years of similar post-conviction jurisprudence. In any event, even if we are to use a de novo

27

standard relative to the question of whether the petitioner received the effective assistance of counsel, we do not believe that the petitioner received the ineffective assistance of counsel, given the underlying facts as found by the trial court.

## A. Guilt Phase–Failure to Investigate

The petitioner contends that his trial attorneys were ineffective during the guilt phase of his trial because they failed to investigate the petitioner's low serotonin and blood sugar levels and to explore a possible insanity defense. He argues that his attorneys were ineffective by defending the case solely "on the merits." The state contends that the trial court correctly found that the petitioner received the effective assistance of counsel.

The trial court found that the petitioner's attorneys rendered effective assistance, making the following findings and conclusions:

> Petitioner was examined twice at the request of his attorneys by a competent forensic psychologist, Dr. Wyatt Nichols, who would not support a defense of insanity. Although not called by either side at the hearing on this petition, Dr. Nichols testified at petitioner's trial that at the time of the trial he had been practicing clinical psychology for eleven or twelve years, with specialized training in forensic psychology. The State stipulated to his qualifications, and he was accepted by the trial court as an expert in the field of forensic psychology. The constitutional requirements of *Ake v. Oklahoma*, 470 U.S. 68 (1985), were satisfied. Dr. Nichols testified at petitioner's trial that
>
>> A. . . . . It was my opinion that [petitioner] was not criminally insane and did not appear to me to suffer from a mental illness that was sufficient for me to be concerned.
>>
>> Sometimes people who are really severely mentally ill will say they didn't do it, but in fact they may have and there's a real severe illness there that will interfere with their ability to communicate. But I did not see that. So it was my final opinion that he failed the Graham Vs. State test, and so basically he was criminally responsible.
>>
>> Q. Does that mean that he -- that you didn't see any psychological problems at all?
>>
>> A. No. It doesn't mean that. It just means that he didn't meet the Graham Vs. State criteria that I mentioned earlier as far as a mental illness.
>
> There was no indication at the time of petitioner's trial that Dr.

28

Nichols' opinion was in any way impeachable, and the attorneys therefore had no "specialized need" for further evaluation that they could have given the trial court on the issue of an insanity defense during the guilt phase . . . .

Mr. Ball . . . testified that in his experience, insanity defenses aren't very successful, and that he would have to basically admit to the murder, but say petitioner was not legally responsible for it. On redirect, he testified that even though he had no expert proof to rebut the fingerprint evidence, the proof at the trial was that petitioner had been at the victim's house before, having known the victim and having hung around with her grandson. (The garage petitioner worked at was owned by Mike Lucas, the employer, friend and drug partner of petitioner. He was also the step-grandson of Ms. Skinner.) Mr. Ball felt the case could have been won.

. . . . Eliminating the "distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time," *Strickland* at 689 and *Hellard* at 9, it would have been extremely risky to have attempted a defense of insanity, in light of the entirely circumstantial proof offered, even if an expert witness who would support an insanity defense could have been found, knowing that Dr. Nichols in that event would then be called as a state's witness against the petitioner.

This Court finds that not only were petitioner's attorneys not deficient in their performance during the guilt phase on the issue of insanity, but that there has also been no showing of prejudice to petitioner.

. . . .

Petitioner has completely failed to carry his burden of proving that his attorneys 1) should have known to file a motion for additional psychological assistance on the issue of insanity, 2) that his attorneys could have shown a specialized need for that assistance, if requested, 3) that the expert assistance, had it been granted, would have revealed a chemical imbalance in petitioner's system, and 4) if it had, that a viable theory of [insanity] could have been made out to the jury that would have been better than the defense actually tried. Petitioner has not shown that there is a reasonable probability (a probability sufficient to undermine confidence in the outcome) that but for counsel's not asking for additional psychological assistance, the result of the guilt phase would have been different. *Strickland,* at 694. Petitioner has not established either prong of the *Strickland* test, either deficiency or prejudice, in the guilt phase, and therefore this allegation is without merit.

We hold that the petitioner has failed to establish that the record preponderates against the trial court's findings. Mr. Ball testified that the petitioner could carry on intelligent conversations and that the petitioner did not act out of touch with reality. Mr. Ball further testified that the petitioner did not want to pursue an insanity defense. The petitioner was examined twice by Dr. Nichols, and although he

29

recommended further testing to discover the extent of the petitioner's mental condition, he stated that his findings would not support an insanity defense. Thus, the petitioner has not shown that his attorneys would have been able to demonstrate a specialized need for further evaluation of the petitioner to pursue an insanity defense.

### B. Sentencing Phase–Failure to Investigate and Request Expert Services

The petitioner contends that his attorneys were ineffective during the sentencing phase of trial. He argues that the attorneys failed to investigate fully the petitioner's background and failed to seek expert mental services for mitigation until the trial had already begun. The petitioner argues that the jury might have returned a life sentence if it was presented with the evidence regarding the petitioner's low serotonin level, hypoglycemia and alcohol addiction, as well as more detailed information about the petitioner's tumultuous relationship with his family, particularly his mother. The state contends that the attorneys were not deficient and that the petitioner has failed to demonstrate prejudice. Regarding the presentation of mitigating evidence during the capital cases, our supreme court has stated as follows:

> Where the alleged prejudice under Strickland involves counsel's failure to present mitigating evidence in the penalty phase of a capital trial, several factors are significant. First, courts have analyzed the nature and extent of the mitigating evidence that was available but not presented. Second, courts have considered whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Finally, the courts have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.

Goad v. State, 938 S.W.2d 363, 371 (Tenn. 1990) (citations omitted).

First, we will address the petitioner's contention that his attorneys were ineffective for failing to conduct further investigation into his social background for mitigation evidence at the sentencing phase. We believe that the petitioner has demonstrated neither deficiency nor prejudice. With respect to the attorneys' failure to secure the petitioner's school records, Mr. Ball testified that both he and the public defender requested but never received the materials. Mr. Ball testified that he went to Louisiana and spoke with the petitioner's family but that he was not allowed access to the petitioner's mother. He testified that during his interviews with the petitioner's father and brothers, he learned that the petitioner was severely abused as a child. Defense

counsel presented this evidence during the sentencing phase of the trial, along with evidence of the petitioner's enuresis and the problems associated with it and the petitioner's abuse of alcohol and drugs. The trial court's order denying post-conviction relief states the following:

> This brief summary of the high points in the mitigation evidence presented in petitioner's trial does not adequately reflect the quality or extent of the proof offered. Altogether, petitioner presented 167 pages of transcript in mitigation during the sentencing phase. Much of it was highly emotional, and even from a cold reading of the transcript seven years later this Court was moved by petitioner's account, and his brothers' accounts, of his tragic childhood.

The petitioner has failed to show that his attorneys did not adequately investigate and present his social history, nor has he shown a reasonable probability that, had they performed further investigation, the outcome of the sentencing phase would have been different.

With respect to the petitioner's contention that his attorneys were ineffective for failing to request expert mental services for mitigation until after the trial had started, the trial court found that the attorneys were deficient. The trial court stated that because Dr. Nichols suggested additional neurological testing to explore the petitioner's mental condition, the trial judge "would most likely have given the attorneys funds for this neurological workup and also a continuance to obtain it." However, the trial court found that the petitioner failed to demonstrate prejudice. The trial court determined that all of the proof raised at the evidentiary hearing was presented at the mitigation hearing, except for the evidence of the petitioner's hypoglycemia, low serotonin, and the effects of the two when combined with alcohol and drugs. The trial court determined that even if the petitioner had been further evaluated, it is unlikely that his serotonin and glucose levels would have been tested. The trial court found that substantially similar mitigating evidence was presented at trial in that Dr. Nichols testified that the petitioner may have had an organic brain impairment that interfered with his ability to control urges. Finally, the trial court determined that the strong evidence of other aggravating factors shows that the mitigating evidence would not have affected the jury's determination. See Goad, 938 S.W.2d at 371.

The record supports the trial court's finding of deficient performance. The

31

petitioner's attorneys originally made an <u>ex parte</u> motion for expert services that was denied for failure to comply with Rule 13, § 2(B)(10), Tenn. Sup. Ct. R. Then, in what the trial court characterized as a last ditch effort to secure expert services, the attorneys presented a letter from Dr. Nichols to support their specialized need for evaluation, and they requested a continuance in order to conduct the evaluation. However, they did not present the letter until the fifth day of trial. As the trial court stated in its order denying the post-conviction petition, "[w]hen proof of a specialized need is not obtained until the fifth day of trial, however, there is not much likelihood that a continuance will be granted." The petitioners have provided no reason why this letter or an affidavit from Dr. Nichols was not presented before trial. Failure to investigate, follow up, and present evidence of a history of mental problems for use at the sentencing phase of a capital case is deficient performance. <u>Cooper v. State</u>, 847 S.W.2d 521, 530-32 (Tenn. Crim. App. 1992).

Despite the attorneys' deficiency, the petitioner has failed to demonstrate that the record preponderates against the trial court's determination of no prejudice. Most significant is the fact that the petitioner has not shown that if the evaluation suggested by Dr. Nichols had been performed, evidence of the petitioner's hypoglycemia or low serotonin would have been discovered. The trial court found as follows:

> [A]t the time of petitioner's trial in 1990, the "low serotonin" defense and the "low blood sugar" defense were relatively unknown. There were only three significant articles produced by petitioner that had been published in this area in scientific journals. . . . It is clear that the relationship between serotonin and impulsive behavior was not widely known in 1990. Dr. Auble had not yet attended any seminars in forensic psychology at the time of petitioner's trial, and Dr. Martell had not yet published any of his articles on the relationship between serotonin and violent behavior. Dr. Nichols had suggested to the attorneys that a "Q Beam" or an "MRI" be performed . . . . Both Drs. Auble and Martell agree that those tests would have turned up nothing useful in petitioner's defense had the attorneys requested and obtained funds for them. No one at any time ever suggested to petitioner's trial attorneys that they test the chemical balance of his spinal fluid.
>
> They could hardly have been expected to have been familiar with 5-Hydroxyindoleacetic Acid, or to have read any of those three articles on their own.

In light of the fact that the "low serotonin" and "low blood sugar" research and theories were not widely known and that Dr. Nichols' suggested evaluation did not contemplate

testing for such imbalances, the petitioner has not demonstrated a reasonable probability that but for his attorneys' deficiency in failing to request expert services in a timely fashion, the outcome of the sentencing phase would have been different.

In making this determination, we are also mindful of the principles set forth in Goad. The trial court made the following determinations with respect to these principles:

> The first question to be considered under *Goad* . . . is the nature and extent of the mitigating evidence that was available but not presented. Except for proof at the hearing on this petition of petitioner's low serotonin levels and low glucose tolerance level, and their effect on petitioner when combined with drug and alcohol use, all other proof of mitigation raised by petitioner in the hearing on this petition had already been presented at trial by his attorneys, in one form or another, through jail records, lay witnesses, family members of petitioner, and Dr. Nichols. . . .

> The second consideration under *Goad* is "whether substantially similar mitigating evidence was presented to the jury in either the guilt phase or penalty phase of the proceedings." The possibility that petitioner had these problems due to a medical or psychological condition was presented to the jury during mitigation proof by Dr. Nichols. He testified that

>> Mr. Cazes's behavior as far as his history of chemical dependency which causes brain damage over an extended period of time like he's abused chemicals, plus even before he started abusing chemicals he had a lot of difficulties with impulse control, rages, becoming angry for no apparent reason, and becoming – going into a rage and being destructive at times. And people who have these problems, a fairly high number of them have neurological problems.

>> What I mean by neurological problems, some kind of organic impairment with their brain that interferes with their ability to control an urge, a momentary urge. Not necessarily that it would interfere with their ability to plan out something over a long term, but any time their affect or their feelings are elevated, be it anxiety, be it anger, be it excitement, they're happy about something just like a little child at Christmas may get into a lot more trouble because they're real excited about things, well, they're having impulse control problems. Well, that's what I'm talking about here, that when his affect is up, his feeling level is up, then he may have more difficulty or he does have more difficulty controlling himself.

>> There's a possibility that that is due to some brain impairment or organic impairment . . . .

33

Even though we know now, after petitioner has been thoroughly tested, that he had no significant brain damage due to drug use or head trauma, still the jury was told that it was a distinct possibility that many of his problems were caused by a condition out of his control.

The third *Goad* consideration is "whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination." Assuming therefore, that the attorneys had properly and timely requested and received funds, and time, to further evaluate petitioner, and that they had in fact found an expert who was acquainted with the relationship between serotonin and impulsive behavior, and petitioner decided to present that mitigation evidence to the jury (that a combination of low serotonin, low blood sugar, extensive substance abuse, tragic childhood and hatred of women had all combined to make petitioner not responsible for his actions), the state would have been able to rebut that theory with petitioner's history of continued violence in a prison setting while awaiting trial, during a time when he had a raised serotonin level, was not on junk food, and was not using alcohol or illegal drugs. This violent behavior would most likely have alienated the jury. An important part of this theory of petitioner also concerns his hatred of women and his continued violence toward them, a rage which was "triggered" by an "emotional memory," compelling him to rape and murder Ms. Skinner in a "fugue state." This would have also tended to alienate the jury, and in view of the aggravating circumstance offered in this trial that petitioner had been convicted of the Aggravated Rape and Attempted Murder of another woman which was committed after the murder of Ms. Skinner, may have practically ensured a sentence of death.

. . . .

Considering the nature of the omitted mitigation, necessarily involving petitioner's hatred of women and his lack of control even when not on drugs, alcohol, junk food and low serotonin, as compared to the strong aggravating factors [1] "heinous, atrocious and cruel," in that the crime involved a driving to the scene, a systematic, premeditated breaking into the home of a known elderly victim, an extremely bloody, brutal murder and rape . . . ., plus 2) "prior convictions for crimes of violence" in that petitioner, after raping and killing Ms. Skinner, committed and was convicted of another Aggravated Rape and Assault to Murder] petitioner has failed to show prejudice. . . . "Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion of the jury that the aggravating circumstances outweighed the mitigating circumstances and hence, the sentence imposed." Strickland, at 697.

Considering the petitioner's inability to demonstrate even a possibility that serotonin and blood sugar testing would have been performed and considering the principles set forth in Goad and their application to this case, we conclude that the petitioner has not demonstrated prejudice.

### C. Petitioner's Right to a Limited Cross-examination

34

The petitioner contends that his attorneys were ineffective for failing to protect his right to a limited cross-examination during the sentencing phase of trial. He contends that he wanted to testify at the sentencing phase about his background without being subject to cross-examination regarding details of the crime and that his attorneys filed a motion to prevent the state from asking questions about the crime, which the trial court denied. The petitioner argues that his attorneys offered no support for their motion and inadvertently waived the issue for appeal by asking the petitioner what he remembered about the day of the murder.

On direct appeal, our supreme court acknowledged that "in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does not operate as a complete waiver of the privilege against self-incrimination." Cazes, 875 S.W.2d at 266. Nevertheless, the court determined that the petitioner was not prejudiced by the cross-examination because the petitioner could not recall anything about the crime. Id. Similarly, in denying post-conviction relief, the trial court concluded that the "state's cross-examination was therefore effectively limited by petitioner's testimony that he lacked any knowledge of the circumstances of the offense." The petitioner has not demonstrated that the record preponderates against this finding.

### D. Conceding Premeditation

The petitioner contends that counsel were ineffective during closing argument at sentencing because they mentioned that the jury had already found premeditation. The petitioner contends that because he was convicted of felony murder, which does not require premeditation, this erroneous reference by counsel resulted in prejudice. The petitioner offers no support for this argument, and we hold that it is without merit. A review of the closing argument shows that counsel focused not on the crime itself but on mitigation. The petitioner has not demonstrated prejudice.

### E. Failure to Raise all Issues on Appeal

The petitioner contends that his attorneys were ineffective on appeal for failing to raise all issues. Specifically, he contends that the attorneys should have argued that (1) the jury's finding of the "prior violent felony" aggravating circumstance

35

violated the ex post facto and due process clauses of the Tennessee and United States Constitutions, (2) the reasonable doubt jury instruction violated the due process clause of the United States Constitution, and (3) the manner in which appellate courts conduct harmless error analysis in capital cases violates state guarantees of trial by jury and federal guarantees of due process. Our supreme court has previously determined that these issues are without merit. See King v. State, 992 S.W.2d 946 (Tenn. 1999); State v. Bigbee, 885 S.W.2d 797, 817 (Tenn. 1994); State v. Nichols, 877 S.W.2d 722, 734 (Tenn. 1994); State v. Howell, 868 S.W.2d 238 (Tenn. 1993).

### III. IMPARTIAL JURY

The petitioner contends that he was denied the right to an impartial jury because the trial court refused to allow individual, sequestered voir dire concerning pretrial publicity. In conjunction, he argues that his attorneys were ineffective for failing to include examples of pretrial publicity in the record for appeal.

With respect to the petitioner's claim of ineffective assistance of counsel, the petitioner claims that his attorneys failed to include examples of the pretrial publicity in the record for appeal. The petitioner argues that this precluded the supreme court from adequately addressing the jury voir dire issues on appeal. However, this particular claim was neither included in the post-conviction petition below nor addressed by the trial court. Accordingly, this issue is not properly before this court and is waived. See Tenn. Code Ann. § 40-30-112 (1990); Butler v. State, 789 S.W.2d 898, 902 (Tenn. 1990); Brown v. State, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996). Regardless, the petitioner has failed to establish prejudice.

"Individual voir dire is mandated only when there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material." State v. Harris, 839 S.W.2d 54, 65 (Tenn. 1992) (citing State v. Porterfield, 746 S.W.2d 411, 447 (Tenn. 1988)). The decision of the trial court to deny individual voir dire of the venire remains within the sound discretion of the court and will not be reversed on appeal absent a finding of manifest error. Howell, 868 S.W.2d at 247-48. The petitioner must demonstrate that the jurors were biased or prejudiced against him

36

because of the pretrial publicity. State v. Melson, 638 S.W.2d 342, 360-61 (Tenn. 1982). Mere exposure to news accounts of the incident does not, standing alone, establish bias or prejudice. Prospective jurors can have knowledge of the facts surrounding the crime and still be qualified to sit on the jury. State v. Bates, 804 S.W.2d 868, 877 (Tenn. 1991). The test is "whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." State v. Kyger, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989).

In support of his claim, the petitioner relies upon State v. Claybrook, 736 S.W.2d 95 (Tenn. 1987) and State v. Shepherd, 862 S.W.2d 557 (Tenn. Crim. App. 1992). In both of these cases, the court determined that the trial court's refusal to allow individual, sequestered voir dire was prejudicial error because the prospective jurors admitted that they knew the defendants had been charged with or convicted of other crimes. In Claybrook, the court determined that the need to conduct individual, sequestered voir dire became apparent "when it was made known to the trial court that 80% of the first group of prospective jurors had heard information regarding the defendant's case, two members of that initial panel mentioned in the presence of other prospective jurors that they had heard that the defendant had been in prison before." 736 S.W.2d at 100.

In the present case, however, the jurors were not questioned about their knowledge of the petitioner's previous record. Additionally, as the trial court noted in denying post-conviction relief, "[o]f the prospective jurors examined, approximately twenty-five percent had been exposed to some pretrial publicity about this case . . . ." The record establishes that only two of the jurors who heard the petitioner's case had been exposed to pretrial publicity, and unlike Claybrook, no evidence exists that the jurors heard information that the petitioner had previously been in jail. The empaneled jurors stated that they could render an impartial verdict based solely upon the evidence presented at trial. Thus, the petitioner has not demonstrated, as is required, that the jurors who actually heard his case were biased or prejudiced because of pretrial publicity.

Finally, we note that in his reply brief, the petitioner asserts in a footnote that Rule 606(b), Tenn. R. Evid., effectively precluded him from demonstrating prejudice by disallowing the testimony of jurors at the evidentiary hearing. He relies upon Henley v. State, 960 S.W.2d 572 (Tenn. 1997). In Henley, the petitioner presented affidavits from jurors at the evidentiary hearing stating that they were swayed against the petitioner because his mother did not testify during the sentencing phase of a capital trial. The court concluded that the affidavits were not admissible because they "related to the precise subject matter about which a juror is strictly forbidden from testifying by Rule 606(b)- the effect of the mother's failure to testify on the jury verdict." 960 S.W.2d at 581. However, we do not believe that the holding in Henley precludes the use of juror affidavits to prove prejudicial exposure to pretrial publicity. See, e.g., Claybrook, 736 S.W.2d at 100-01 (holding that jurors' testimony regarding exposure to pretrial publicity allowed at motion for new trial); State v. Robert Emmet Dunlap, Jr., No. 02C01-9801-CC-00009, Henry County (Tenn. Crim. App. Sept. 21, 1998) (holding that the "extraneous prejudicial information" exception to the admissibility of juror testimony includes a juror's personal knowledge of an accused's prior criminal record).

## IV. USE OF AGGRAVATING CIRCUMSTANCE

The petitioner contends that the use of his previous convictions for aggravated rape and assault with intent to murder, based on conduct that occurred after the present offenses but for which the petitioner was convicted before the present offenses, violates the due process and ex post facto clauses of the state and federal constitutions.

The petitioner committed the crimes against Ms. Skinner at issue in this case in April 1988. In June 1989, the petitioner committed separate offenses of attempted murder and aggravated rape, and he was convicted of these crimes before the trial in

the present case. The state relied upon these previous convictions as an aggravating circumstance. See Tenn. Code Ann. § 39-2-302(I)(2).

The petitioner contends that using convictions for crimes committed after the offense in the present case to enhance his punishment in the present case violates due

38

process and ex post facto. Our supreme court rejected the same argument in State v. Caldwell, 671 S.W.2d 459, 465 (Tenn. 1984). In Caldwell, the court stated:

> The Defendant avers that it was error for the Trial Court to allow the introduction of his conviction for first degree murder in the Lipford case as an aggravating circumstance in this case, since the Lipford murder occurred after the [murder in this case].
> . . . .
>
> Caldwell claims that using the subsequent murder as an aggravating circumstance permits an ex post facto law. The language in the statute, "previously convicted" clearly indicates that the date of the conviction, not of the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant, as long as the
>
> convictions have been entered before the sentencing hearing at which they are introduced into evidence.

Id. at 464-65; see also State v. Hodges, 944 S.W.2d 346, 357 (Tenn. 1997) ( "We have previously held on numerous occasions that so long as a defendant is convicted of a violent felony prior to the sentencing hearing at which the previous conviction is introduced, this aggravating circumstance is applicable."). In the present case, the aggravating circumstance was in effect at the time the petitioner committed the crimes against Ms. Skinner. In addition, Caldwell provided further notice to the petitioner that future convictions could be used to enhance punishment, regardless of when the criminal acts underlying the convictions were committed. This issue is without merit.

## V. EXCULPATORY EVIDENCE

The petitioner contends that the state withheld police reports containing exculpatory information in violation of Brady v. Maryland, 370 U.S. 83, 83 S. Ct. 1194 (1963). He argues that the information in the police reports was exculpatory, claiming that it provided substantial clues that should have led the trial attorneys to investigate petitioner's mental condition. The state contends that the prosecutor was not required to disclose the complete police investigation and that, in any event, the information contained in the reports was not exculpatory.

The state has a duty to furnish exculpatory evidence to the accused, and any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87, 83

39

S. Ct. at 1196-97. This evidence may pertain to the guilt or innocence of the accused or to the punishment which may be imposed if the accused is convicted of the crime. See State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Moreover, this duty to disclose extends to all favorable information regardless of whether the evidence is admissible. Branch v. State, 469 S.W.2d 533, 534 (Tenn. Crim. App. 1969). Although Brady does not require the state to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. State v. Reynolds, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). The duty does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution. Banks v. State, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977). Similarly, there is "'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.'" State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995) (quoting Moore v. Illinois, 408 U.S. 786, 92 S. Ct. 2562 (1972)).

In order to establish a Brady due process violation, the following elements must be proven:

> (1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
>
> (2) The State must have suppressed the information;
>
> (3) The information must have been favorable to the accused; and
>
> (4) The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). In Edgin, our supreme court adopted the following standard for materiality:

> [T]here is constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."
> . . . .
>
> "[The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's

40

> evidentiary suppression 'undermines confidence in the outcome of the trial.'"

902 S.W.2d at 390 (<u>quoting</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S. Ct. 1555, 1556 (1995)).

The petitioner's attorney testified at the evidentiary hearing that he never received copies of the police reports. Gloria Shettles testified that she interviewed the persons named in the report and that they stated that the petitioner was an excellent worker; did not take criticism well; was impatient, emotional and impulsive; and would become angry and out of control when he was drinking. The trial court dismissed the claim, finding that the petitioner did not specifically define his issue and offered insufficient proof to support his allegations.

We believe that the petitioner's claim fails because he has not established that he was unable to obtain the information himself, that the evidence was favorable, or that the information was material. The information contained in the police reports is general background information of the petitioner's demeanor, provided by the petitioner's friends, acquaintances and former employers. Because the information came from people the petitioner knew, there is no reason why he could not have obtained the information himself. Additionally, the information does not contain direct exculpatory information. Despite the petitioner's argument that the information could have led his attorneys to investigate the petitioner's mental status further, the police reports do not provide any additional information of which the attorneys were not already aware at trial. Furthermore, we believe that the petitioner has not demonstrated a reasonable probability that the result of the proceeding would have been different had his attorneys been aware of the reports. We have previously determined that the trial court properly found against the petitioner regarding his claim of ineffective investigation into a possible insanity defense. Thus, the petitioner has failed to show that the information is material.

## VI. REASONABLE DOUBT JURY INSTRUCTION

The petitioner contends that the reasonable doubt jury instructions at both phases of his trial were unconstitutional because the trial court used the term "moral

certainty" and excluded from the definition a "doubt that may arise from possibility." The reasonable doubt jury instructions contested by the petitioner were upheld as constitutional. See Carter v. State, 958 S.W.2d 620, 625 (Tenn. 1997); Nichols, 877 S.W.2d at 734. This issue is without merit.

## VII. CUMULATIVE EFFECT OF ERROR

The petitioner contends that the cumulative effect of all the alleged constitutional errors resulted in the petitioner being deprived of a fair trial. See State v. Cadle, 634 S.W.2d 623, 626 (Tenn. Crim. App. 1982). Considering our rulings in this

case, we conclude that no errors exist that cumulatively would deprive the petitioner of a fair trial. See Rosenthal v. State, 292 S.W.2d 1, 4-5 (Tenn. 1956).

## VIII. HARMLESS ERROR ANALYSIS

The petitioner contends that the Tennessee Supreme Court's harmless error analysis on direct appeal with respect to the jury's erroneous application of the felony murder aggravating circumstance violated his right to a jury determination of sentencing and to due process of law. He argues that Tennessee law creates a due process liberty interest in jury resentencing that precludes the court's application of a harmless error analysis when the sentencing jury has considered an invalid aggravating circumstance. This argument has been rejected by our supreme court. See Boyd v. State, 959 S.W.2d 557, 560 (Tenn. 1998) (holding that a jury's reliance on an invalid felony murder aggravating factor does not require a resentencing hearing if the reviewing court concludes beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid aggravating factor). This issue is without merit.

## IX. IN CAMERA REVIEW OF PROSECUTOR'S FILES

The petitioner contends that the trial court erred by failing to conduct an in camera review of the prosecutor's files regarding other crimes with which the petitioner had been charged. The petitioner sought to review the files to find information pertaining to his post-conviction issues, particularly the issue of his mental state, but the trial court denied the motion. The files pertain to alleged acts of child sexual abuse,

and the trial court denied the request pursuant to Tenn. Code Ann. § 37-1-612, which prohibits the disclosure of all records concerning reports of child sexual abuse. The statute provides limited circumstances under which disclosure may be allowed, but the trial court determined that those circumstances did not apply in this case.

The petitioner cites <u>Munke v. Munke</u>, 882 S.W.2d 803, 804 (Tenn. Ct. App. 1994), to support his contention that the trial court was required to conduct an <u>in camera</u> inspection. However, in that case, the court held that an inspection was required under the statutory exception to disclosure "for the purpose of protecting a child or children from child abuse or child sexual abuse . . . ." Tenn. Code Ann. § 37-1-612(h). This exception does not apply to the petitioner's case. This issue is without merit. <u>See</u>, <u>e.g.</u>, <u>State v. Caughron</u>, 855 S.W.2d 526, 541 (Tenn. 1993) (holding that a trial court is not required to review the entire prosecutor's file absent a specific showing from the petitioner).

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
Gary R. Wade, Presiding Judge

_____
Thomas T. Woodall, Judge